John J. Nelson (SBN 317598)
**MILBERG, PLLC**
280 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212
Tel: (858) 209-6941
jnelson@milberg.com

*Attorneys for Plaintiffs and Proposed Class*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

NATALIE ANDERSEN, Individually and on behalf of the Medical Solutions 401(k) Plan, and on behalf of all the similarly situated participants and beneficiaries of the plan,

        **Plaintiff,**

   **v.**

MEDICAL SOLUTIONS L.L.C. and MEDICAL SOLUTIONS LLC, EMPLOYEE BENEFITS COMMITTEE

       **Defendants.**

CASE NO.: **'26 CV 3123 RSH MSB**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

1. **Breach of Fiduciary Duty of Prudence**
2. **Faiure to Adequately Monitor other Fiduciaries under ERISA**

## CLASS ACTION COMPLAINT

1. While prudent fiduciaries are not required to find and select the single best performing investment in any category to satisfy their fiduciary duties, no prudent fiduciary would remove an investment that <u>was</u> the best performing investment in its peer category.

2. Plaintiff Natalie M. Andersen ("Plaintiff"), individually and on behalf of all other similarly situated participants, their beneficiaries and estates, and on behalf of Medical Solutions 401(k) Plan ("the Plan"), bring this action under 29 U.S.C. §§ 1132(a)(2) and (3) against Defendants Medical Solutions L.L.C. (the

"Company") and Medical Solutions LLC, Employee Benefits Committee (the "Committee") (collectively, the Company and the Committee will be referred to as "Defendants" or "Fiduciaries"), to remedy Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974, as amended (ERISA), 29 U.S.C. § 1001, *et seq*.

3.      Defined contribution plans that are qualified as tax-deferred vehicles have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, defined contribution plans operate in a manner by which participants bear the risk of high fees and investment underperformance.

4.      As fiduciaries to the Plan, at all times relevant to this Complaint, Defendants were obligated to act prudently and for the exclusive benefit of participants and beneficiaries. Defendants violated their fiduciary duties of prudence by imprudently removing the Plan's American Funds Target Return Fund series ("AF TDF") and replacing that series with the JP Morgan SmartRetirement Target Date Fund series ("JPM TDF"), despite the AF TDF's exceptionally strong long-term performance under Defendants' own criteria and monitoring reports and all accepted Modern Portfolio Theory ("MPT") metrics measuring, returns, risk adjusted performance, manager performance, and cost.

5.      Immediately prior to Defendants deciding to replace AF TDF in late 2020, Defendants' internal monitoring reports showed that not only did the AF TDF perform well, but that it was **in fact the single best performing investment in its TDF peer category under Defendants' criteria for many years**. Despite having reviewed this information, Defendants then decided to replace the AF TDF with the JPM TDF that underperformed their former AF TDF selection under every metric.

CLASS ACTION COMPLAINT

6.      Defendants' substitute TDF offered no advantages over their former selection and thus Defendants could not have engaged in a prudent pecuniary process in replacing the AF TDF with the JPM TDF.

7.      As a result of Defendants' imprudent decision to remove the AF TDF and retain the JPM TDF Funds, Plan participants earned millions of dollars less in retirement savings than they would have earned had Defendants acted prudently and rejected this proposed switch[1]--wherever it came from. Based on the then available data a prudent fiduciary could not have reasonably expected the JPM TDF to outperform the AF TDF in the future.

8.      These facts support the inference that Defendants failed to undertake reasoned and prudent monitoring in replacing the AF TDF.

9.      Defendants also violated their fiduciary duties by both (1) initially selecting; and (2) consistently retaining higher-cost share classes, identical to available lower-cost share classes in all but fees and costs (e.g. selecting and retaining the JPM TDF series' "R5" share class instead of the lower-cost JPM TDF series "R6" share class) as investment options for the Plan, thereby materially diminishing Plan participants' retirement savings with unnecessarily higher expense ratios. But for the decision to reinvest assets in the higher-cost JPM TDF, "R5" share class, participants would have meaningfully higher retirement account balances.

10.     Plaintiff brings this action to obtain the relief provided under 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendants' fiduciary breaches described below, and for other appropriate equitable and injunctive relief under 29 U.S.C. § 1132(a)(3).

**I. JURISDICTION AND VENUE**

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(2).

---

[1] It is unclear why a prudent fiduciary would even consider switching the AF TDF given its past performance. However, one thing is clear—it could not have been driven by the investments' metric performance.

12.    Venue is proper in this judicial district pursuant to 29 U.S.C. § 1132(e)(2) because Defendants reside in the Southern District of California and one or more of the breaches took place in the Southern District of California.

## II. THE PARTIES

### A. Plaintiff

13.    Plaintiff is domiciled in Iowa.

14.    At all relevant times, Plaintiff, by virtue of Plaintiff's employment with the Company and participation in the Plan, is or may become eligible to receive additional benefits under the Plan.

15.    Thus, Plaintiff is a Plan participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

16.    At all relevant times during the Class Period, Plaintiff was invested in the JPM TDF series.

17.    As a result of Defendants' mismanagement of the Plan and violations of ERISA, particularly Defendants' decision to terminate its shares in the AF TDF series and select the JPM TDF series instead, Plaintiff was subject to underperformance and suffered financial losses.

### B. Defendants

18.    The Company resides in the State of California, with its office located at 7676 Hazard Center Dr, Suite 500, San Diego, CA 92108. Upon information and belief, the Company has over 20,000 employees.

19.    At all relevant times the Company was and is the named fiduciary and sponsor of the Plan per 29 U.S.C. § 1002(16)(B) and 29 U.S.C. § 1002(a); a party in interest under 29 U.S.C. § 1002(14)(C); and a Plan fiduciary under 29 U.S.C. § 1002(21)(A), to the extent that it appointed members of the Committee and co-fiduciaries and otherwise exercised discretion over the administration and management of the Plan and/or control of Plan assets.

20.    At all relevant times, the Committee members were fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority respecting the administration or management of the Plan, and/or control of Plan assets. At all relevant times, each Defendant was one or more of the following: a party in interest under 29 U.S.C. § 1002(14)(A); a Plan fiduciary under 29 U.S.C. § 1002(21)(A), to the extent they had or exercised discretion over the administration or management of the Plan and/or control of Plan assets; and/or (3)  a named fiduciary under the Plan.

### III. THE PLAN

21.    The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401(k).

22.    The Plan was established to provide eligible employees with the opportunity to accumulate retirement savings over a long period through the sum of employee and employer contributions and associated investment earnings minus associated expenses.

23.    The Plan is a defined contribution plan covering all eligible employees of the Company and participating subsidiaries. Participants of the Plan can elect to make tax-deferred contributions upon eligibility.

24.    The Defendants control and manage the operation and administration of the Plan. The Defendants have fiduciary responsibility for the investment of the assets of the Plan.

25.    The Plan is subject to the provisions of ERISA.

26.    From the beginning of the Class Period[2] to 2024 the Plan managed assets ranging between $65 million and $431 million. As of the end of 2024, the Defendants managed $431,600,349 in Plan assets for over 24,669 participants.

---

[2] As used herein, "Class Period" refers to the six years prior to the filing of this complaint.

CLASS ACTION COMPLAINT

27. Upon information and belief, in light of the large size of the Plan and the vast resources of its Fiduciaries at all times relevant to the Class Period, the Plan had access to a wide array of plan investment options and Defendants had the ability to investigate and monitor the Plan's investments.

## IV. DEFENDANTS' FIDUCIARY OBLIGATIONS

28. ERISA imposes strict fiduciary duties upon the Defendants as fiduciaries of the Plan, including the duty of prudence. These duties apply to all fiduciary acts, including the Defendants' selection and retention of investment options for the Plan.

29. ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B).

30. As part of its fiduciary duty, the Defendants "ha[ve] a continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id*. at 530. If an investment is imprudent, Defendants "must dispose of it within a reasonable time." *Id*. (citation omitted).

31. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

32. In addition, 29 U.S.C. § 1105(a)(2), establishes liability for a fiduciary who enabled the breach of a co-fiduciary, even if the fiduciary does not have knowledge of the other fiduciary's breach.

33.    Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.

## V. BACKGROUND ON TARGET DATE FUNDS

34.    In a recent report to Congress, the U.S. Government Accountability Office ("GAO") noted that Target date funds ("TDFs") are widely offered and have become the most popular investment option used by 401(k) plan participants.[3] TDFs allocate assets over time based on participants' targeted retirement dates. Plan sponsors often choose TDFs as their default investment because TDFs offer a "set it and forget it" option for participants.

35.    The investment objective of a target date fund series is to provide an asset allocation strategy that changes its asset allocation over time as investors get closer to their expected retirement date. The name of each fund in a target date series typically refers to its target date, which corresponds approximately to the investor's anticipated retirement date. For example, a fund with a name like "Retirement Fund 2040" or "Target 2040" is designed for individuals who intend to retire in or near the year 2040. Target retirement years are often offered in five-year increments. The specific retirement date of a fund in a target date series is often referred to as a "vintage." For example, funds in a target date fund series for plan participants expected to retire around 2040 would typically be referred to as the 2040 vintage of that series while the fund in a target date fund series for plan participants expected to retire around 2030 would typically be referred to as the 2030 vintage target for that specific target date fund series.

36.    The Capital Group Companies, Inc. ("Capital Group") is an investment management company that created and manages the AF TDF series. JPMorgan Distribution Services, Inc., an affiliate of JPMorgan Chase & Co., (collectively

---

[3] Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), https://www.gao.gov/assets/870/868017.pdf (last accessed February 19, 2026).

"JPMorgan"), is an investment management/distribution company that created and manages the JPM TDF series. Like most target-date fund series, both AF TDF and JPM TDF are structured as "fund[s] of funds," which means that each vintage invests in other Capital Group and JPMorgan proprietary funds rather than individual securities. For example, each vintage in the AF TDF may be invested in differing proportions of proprietary Capital Group equity funds, bond funds, real estate funds, and money market funds. In other words, each vintage of the AF TDF invests in a combination of proprietary Capital Group mutual funds to provide varying exposure to a mix of asset classes such as U.S. stocks (large-caps and small-caps), international stocks, U.S. bonds, international bonds, investments linked to real estate, and cash-equivalent securities. These asset classes can be further categorized generally as allocations to equities or as allocations for fixed income.

37. Each equity allocation is intended to provide exposure to a specific market segment. Typically, those segments include U.S. large-, mid- and small-capitalization companies and international (non-U.S.) developed and emerging markets. The portfolio manager's aim should be to build a portfolio that provides exposure to factors commonly tied to a stock's potential for enhanced risk-adjusted returns relative to the market.

38. Each fixed income allocation is intended to provide diversified exposure across a wide range of market sectors, including U.S. government obligations, corporate investment grade and below investment grade bonds (commonly known as "high yield bonds" or "junk bonds"), other U.S. aggregate bond sectors (including mortgage- and asset backed securities), and emerging market and international fixed income issues. The portfolio manager's aim is to provide broadly diversified fixed income exposure and construct a portfolio to enhance issuer diversification and liquidity.

39. Under ERISA, each vintage of a target date fund series is required to be consistent with the prudent investor standard which incorporates MPT.

40.    TDFs seek to achieve their objectives by rebalancing assets over time to become less focused on growth (lowering their allocation to stocks) and more focused on preservation (raising their allocation to bonds) as the fund approaches and passes the target date. The asset mix between equity and fixed income shifts dynamically over time, becoming less risky over a person's working career and into retirement. The transition from higher risk to lower risk is often referred to as the "glide path."

41.    Unlike most of the equity and fixed income asset categories that comprise the underlying investments contained in TDFs for which there are often several scores of alternatives, there are far fewer TDF options. For example, in 2020, there were only a couple dozen established TDFs that had a 15-year track record. A closer look reveals that, as shown in Figure 1 below, assets were highly concentrated in the top 5 largest TDFs, which accounted for over 78% of all TDF-invested dollars as of 2020 and 21, and that the AF TDF was among these top 5 most selected TDFs.

### Figure 1

**Exhibit 13** The 10 Largest Target-Date Providers

| Firm | Target-Date Series | Assets (USD in Billions) | | | Market Share | |
|------|--------------------|--------------------------|---|---|--------------|---|
| | | Mutual Fund | CIT | Total TDF | 2021 | 2020 |
| **Vanguard** | | | | 1,190 | 36.4% | 36.7% |
| | Vanguard Target Retirement | 660 | 530 | | | |
| **Fidelity** | | | | 460 | 14.1% | 13.3% |
| | Fidelity Freedom | 221 | — | | | |
| | Fidelity Freedom Index | 106 | 46 | | | |
| | Fidelity Freedom Blend | 11 | 55 | | | |
| | Fidelity Advisory Freedom | 21 | — | | | |
| | Fidelity Flex Freedom Blend | <1 | — | | | |
| | Fideity Managed Retirement | <1 | — | | | |
| **T. Rowe Price** | | | | 374 | 11.5% | 11.6% |
| | T. Rowe Price Retirement | 180 | 170 | | | |
| | T. Rowe Price Target | 4 | 1 | | | |
| | T. Rowe Price Retirement Hybrid | — | 16 | | | |
| | T. Rowe Price Retirement Blend | <1 | 4 | | | |
| **BlackRock** | | | | 289 | 8.8% | 9.5% |
| | BlackRock LifePath Index | 61 | 226 | | | |
| | BlackRock LifePath Dynamic | 1 | 1 | | | |
| | BlackRock LifePath ESG Index | <1 | — | | | |
| **American Funds** | | | | 248 | 7.6% | 7.2% |
| | American Funds Target Date Retirement | 239 | 9 | | | |

## A. The Standard of Care for Prudent Fiduciaries Selecting, Retaining a TDF Series.

42. ERISA's fiduciary duty of prudence requires that fiduciaries must act in accordance with the prudent investor standard when making decisions related to plan investments. This means that in order to be prudent, fiduciaries are required to follow accepted investment theories and prevailing investment industry practices. *Tibble v. Edison Int'l*, 575 U.S. 523, 529-30 (2015). For the last several decades, the most accepted investment theory is MPT which has been incorporated into the prudent investor standard.

43. A prudent TDF selection and monitoring process considers a wide array of metrics commonly accepted and incorporated in MPT that allow the fiduciary to properly assess the prudence of any potential TDF series.

CLASS ACTION COMPLAINT

44. A prudent process considers all the metrics and circumstances present at the time of the selection/retention/removal decision in order to evaluate whether the TDF should be selected or retained.

45. Accordingly, the minimum standard of care for prudent plan fiduciaries selecting and retaining investment options to be made available for plan participants always requires an analysis of the risk-adjusted performance of the selected or retained investment options.

46. While the selection of a target date series is a bit more complex than the selection of a single-strategy investment option, retirement plan experts have also developed a minimum standard of care with respect to the selection and retention of target date series.

47. The most critical criteria for selecting and retaining target date fund series are performance, risk (which incorporates risk-adjusted performance), fees, and the "glide path" dynamic asset allocation (also sometimes called "portfolio construction"). These quantitative criteria are also supplemented with some qualitative criteria that are often merely proxies for an increased risk of future underperformance, *e.g.*, a change in the investment manager's ownership or key personnel, a shift in the investment manager's philosophy or process, or the investment manager's involvement in litigation or fraud allegations.[4]

48. And of course, the actual performance of an investment is the most important criteria to the investor (plan participant) and is accordingly always considered when evaluating a target date series. And because each target date series might incorporate a glide-path that takes on relatively more (or less) risk, the risk-

---

[4] *See* Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p. 50, https://www.gao.gov/assets/870/868017.pdf (last accessed May 19, 2026); *See also* CAPTRUST's "Best Practices for Target Date Fund Selection, https://www.captrust.com/wp-content/uploads/2019/05/tdftips.pdf (last accessed January 20, 2026); Callan Institute, Defined Contribution Trends Surveys 2017-2020, 2022.

CLASS ACTION COMPLAINT

adjusted performance metrics are relatively more important for comparing and benchmarking target date series.

49.    As discussed above, when evaluating the risk-adjusted performance and quality of investment managers, the minimum standard of care for prudent plan fiduciaries incorporates standard metrics from MPT. The most important of these criteria include, but are not limited to, the following metrics over three- and five-year trailing periods:

- **Alpha:** A measure of the difference between a portfolio's actual returns and its expected performance, given its level of risk as measured by beta. A positive Alpha indicates the portfolio has performed better than its beta would predict. In contrast, a negative Alpha indicates the portfolio has underperformed, given the expectation established by beta.[5]

- **Sharpe Ratio:** A risk-adjusted returns measure developed by William Sharpe. The Sharpe Ratio is calculated over each time period by dividing a fund's annualized excess returns by the standard deviation of a fund's annualized excess returns to determine reward per unit of risk. The Sharpe Ratio can be used to compare two funds directly on how much risk each had to bear to earn excess return over the risk-free rate.[6] Notably, American Century identifies the Sharpe Ratio is a meaningful investment metric in its marketing materials. *See* https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ (last accessed February 20, 2026) ("Portfolios with

---

[5] *See* Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p. 70-1, https://www.gao.gov/assets/870/868017.pdf (last accessed May 19, 2026)

[6] *See id.* at 71.

CLASS ACTION COMPLAINT

higher Sharpe Ratios tend to provide more return for the same amount of risk as portfolios with lower Sharpe Ratios").

- **Sortino Ratio:** Similar to the Sharpe ratio, the Sortino Ratio (developed by Frank Sortino) uses only the downside risk portion of the standard deviation in the denominator.[7]

50. Some other relevant metrics include the following:

- **Information ratio ("IR"):** a metric that helps the investor evaluate whether the manager of the investment is beating a specific benchmark. An IR above 1.0 is evidence of excellent performance with consistent outperformance of the specific benchmark; an IR between 0.5 and 0.99 is evidence of reasonable manager skill; an IR of below 0.5 is evidence of weak performance as compared to the specific benchmark; and a negative value IR is evidence of consistent underperformance relative to the benchmark.

- **Batting Average ("BA"):** is a measure of a manager's ability to consistently beat the market. It is calculated by dividing the number of months in which the manager beat or matched the fund's primary benchmark index by the total number of months in the period. For example, a manager who meets or outperforms the market every month in a given period would have a batting average of 1.000. A manager who beats the market half of the time would have a batting average of .500.

- **Turnover Ratio:** is the percentage of a mutual fund or other portfolio holdings that have been replaced in the course of one year. Since a fund with a higher turnover ratio will have higher trading fees and short-term capital gains taxes, a portfolio manager with a

---

[7] Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p.71, https://www.gao.gov/assets/870/868017.pdf (last accessed May 19, 2026).

CLASS ACTION COMPLAINT

higher turnover ratio will need to ensure that those trades are generating positive returns in excess of the additional costs.

51.    Additionally, the minimum standard of care for prudent plan fiduciaries selecting and retaining a TDF series requires a comparison of the risk-adjusted performance because no target date series will have an identical glidepath compared to its meaningful comparators.[8] In other words, to satisfy the minimum standard of care under the circumstances then prevailing both prior to and throughout the Class Period, a prudent fiduciary should have considered a comparison of the risk adjusted returns of available peer alternatives.[9]

52.    Accordingly, a prudent plan fiduciary, when determining whether to retain a Target Date Fund series, would evaluate and compare the performance and commonly accepted investment performance metrics such as the ones identified above to meaningful benchmarks including at the very minimum the industry leading peer alternative target date options.

---

[8] *See* 29 C.F.R. §2550.404a-1 ("Investment Prudence Duties" shall include, but is not necessarily limited to "[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties) or menu, to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action compared to the opportunity for gain (or other return) associated with reasonably available alternatives with similar risks.")
[9] *See*, the Target Date Benchmarking section of the Callan Institute, Defined Contribution Trends Surveys 2017-2020, 2022.

CLASS ACTION COMPLAINT

## VI. FACTUAL ALLEGATIONS

### A. Defendants Violated ERISA by Acting to Remove their Well-Performing AF TDF and Replacing it with an Alternative, JPM TDF, that Offered no Quantifiable Advantages over the Replaced AF TDF

#### 1. Even Defendants' Deficient Process Did not Support Removal of the AF TDF

53. Upon requesting documentation from the Plan administrator, Plaintiff received a few documents that provide a limited and incomplete, but nonetheless insightful view into Defendants' process of monitoring investments.

54. Defendants' 2019 Investment Policy Statement "IPS" guided its procedures in monitoring investments and upon information and belief was still in force when the decision to remove the AF TDF was made.

55. The most relevant part to this action of the IPS is the "Investment monitoring" section that in summary provides the following concepts:

- Performance will be established for each investment against an appropriate benchmark index as set forth in the Appendix B of the IPS;
- The investment committee intends to evaluate investment performance from a long-term perspective;
- The investment committee will receive recommendations from advisor(s) with performance reports but retains the discretion to replace investment options;
- The investment committee will review and consider investment option's adherence to the watch list criteria;
- To assist the investment committee in determining when an investment option should be considered for termination, the investment committee has adopted the due diligence criteria set forth in Appendix C of their IPS. The advisor shall assist with recommendations in this process;
- The investment committee should be ultimately guided by prospective future performance in making removal decisions;

- 15 -

56. The IPS's Appendix C: Due Diligence Criteria states that a Fi360 Fiduciary Score in the top 50 percent of peer group is required to pass. This is categorized **as a must pass** for all categories of investments including TDFs. The lower the Fi360 score the better, with zero being the best possible score, and any score above 50 failing the due diligence criteria and resulting in placement on the watch list.

57. This was the Defendants' most important criteria that measured some MPT metrics such as Sharpe Ratio, Returns, Alpha Ratio, and Expense Ratio against peers to establish whether the investment was performing well under measurable quantitative data.

58. While the amount of metrics measured by the Fi360 approach is rather slim, and it does not explain whether the peer group selection was conducted properly, it at least provided the Defendants with some tangible MPT information to assess, risk adjusted performance, manager performance, cost, and returns of their investment as compared to alternative investment in that peer group.

59. Additionally, for TDFs the Committee was also supposed to consider a few supplemental non-pecuniary factors, such as alignment of the TDF's glide path with the demographic profile of plan participants, rigor and efficacy of asset allocation strategy—the TDF's risk/return, rigor and efficacy of the TDF's monitoring of its underlying investments, and reasonableness of fees and expenses of the TDF.

60. Setting aside whether this process was sufficient to monitor their investments, the limited monitoring reports provided valuable information to the Defendants that leading up to the removal of the AF TDF the majority of its vintages **ranked as the single best investments** in their respective vintage peer group categories under this approach.

61. The monitoring report that Defendants' advisors provided to them in Q3 of 2019 examined data as of June 30, 2019, and showed that the AF TDF R6[10] 2060 scored a 0 under Fi360—the highest score possible. A 0 score means that 0 peers outperformed it under the Fi360 Fiduciary Score metrics. The same was true for the vintages, 2055-2020. The only exception was the AF TDF R6 2015 which scored a 24, which is still a passing score with a margin.

62. Thus, at the time of this report the AF TDF series was not only passing but without doubt the absolute best series compared against tens of peer series and hundreds of peer share classes, and vintages under the Defendants' own process for monitoring,

63. The next monitoring report that was provided to the Defendants examining data as of March 31, 2020 showed even better performance—with all AF TDF R6 vintages, 2010-2060 scoring a 0 Fi360 score. The best possible score. This should have made clear to Defendants that not only did they offer a suitable, well performing, best in its category investment for their participants.

64. The next monitoring report that was provided to the Defendants examined data as of June 30, 2020, and demonstrated similarly outstanding performance, with all AF TDF R6 vintages scoring a 0 fi360 score, except the 2010 which scored a 17.

65. Further, not only did these reports demonstrate to the Defendants that current performance was above and beyond anything a prudent fiduciary could ask from an investment, it also showed that this exceptional Fi360 score performance went back at least to Q2 of 2017.

66. The AF TDF R6 2060 scored a 0 from its inception in Q1 of 2018 to Q2 of 2020, with only one exception of scoring a 16 in Q4 of 2019.

67. The AF TDF R6 2055 scored a 0 from Q2 of 2017 to Q2 of 2020.

68. The AF TDF R6 2050 scored a 0 from Q2 of 2017 to Q2 of 2020.

[10] R6 is the share class of this investment which is the same for each vintage across the series.

69. The AF TDF R6 2045 scored a 0 from Q2 of 2017 to Q2 of 2020.

70. The AF TDF R6 2040 scored a 0 from Q2 of 2017 to Q2 of 2020.

71. The AF TDF R6 2035 scored a 0 from Q2 of 2017 to Q2 of 2020.

72. The AF TDF R6 2030 scored a 0 from Q2 of 2017 to Q2 of 2020, with only one exception of scoring a 22 in Q4 of 2019.

73. The AF TDF R6 2025 scored a 0 from Q2 of 2017 to Q2 of 2020, with only two exceptions of scoring a 20 in Q2 of 2017 and a 19 in Q4 of 2019.

74. The AF TDF R6 2020 scored a 0 from Q2 of 2017 to Q2 of 2020, with only two exceptions of scoring an 18 in Q2 of 2017 and a 16 in Q4 of 2019.

75. The AF TDF R6 2015 scored consistently in the high 10s and low 20s, while scoring  0s across four of the quarters from Q2 of 2017 to Q2 of 2020.

76. The AF TDF R6 2010 scored a 0 from Q2 of 2017 to Q2 of 2020, with only three exceptions of scoring a 16 in Q2 of 2017, a 17 in Q1 of 2018, and a 19 in Q4 of 2019.

77. Thus, for more than 13 quarters of exceptional performance as the unquestionably single best performing TDF series under Defendants' monitoring process and with the vast majority of its vintages performing as the single best vintages in their respective categories—Defendants nonetheless, contrary to common sense and its own monitoring, watch list, and removal process, removed the best TDF its participants could have had.

78. While no prudent fiduciary can guarantee the selection of the single best performing investment in its category—it is a certainty that no prudent fiduciary would remove an investment that ranks best in its peer category.

79. It therefore follows that in this case, the Defendants imprudently disregarded their own process and common sense by replacing the AF TDF with JPM TDF in September 2020 or later, despite being aware of their selected AF TDF's dominance in the TDF market and JPM TDF offering no measurable advantages over their AF TDF as discussed below.

**2. If Defendants followed a prudent process and compared the JPM TDF to their previously held AF TDF they would have discovered that the JPM TDF provided no quantifiable advantages over the AF TDF under any MPT metrics.**

80.     Prior to—and throughout—the Class Period, Defendants had access to a tremendous amount of information to evaluate the performance of the AF TDF series and conclude that it was performing fantastically as described above.

81.     Prior to—and throughout—the Class Period, a prudent plan fiduciary at a minimum would have considered and compared, the AF TDF (which the Plan held) to its proposed replacement—JPM TDF (the TDF series with which the Fiduciaries replaced the AF TDF). This comparison would have revealed, what Defendants should have already known from their monitoring reports from 2017-2020, that the AF TDF consistently outperformed the JPM TDF under all MPT metrics.

82.     It is patently imprudent to remove and replace one TDF with another TDF that offers no pecuniary advantage under any metric.

83.     Nonetheless, Defendants decided to remove the AF TDF sometime in late 2020 in favor of the JPM TDF, a fund which provided no measurable advantages over the AF TDF. This decision was completely unsupported by a prudent MPT data approach and their own monitoring reports.

84.     All available data under the circumstances then prevailing when this decision was made, indicated that the AF TDF series demonstrably **performed better under all MPT metrics at all measurable times** from 2018 through 2020 relative to the JPM TDF.

85.     The Defendants' disregard of quantifiable metric performance, such as returns, risk adjusted returns, manager metrics, and costs in making this decision was patently imprudent.

CLASS ACTION COMPLAINT

86.    Specifically, the information available to the Fiduciaries in 2020 was 3- and 5-year lookback performance

87.    For several years prior to and continuing throughout the Class Period, the AF TDF materially outperformed[11] the JPM TDF series options.

88.    Under the circumstances prevailing in late 2020 and later, when confronted with the information that the AF TDF at the end of 2018 and 2019 had performed well in 3- and 5-year returns as well as, risk-adjusted returns, manager metrics, and cost metrics, a prudent fiduciary—following the standard of care for prudent investors—would **not** have decided to remove the AF TDF in 2020, and especially not in favor of a dramatically underperforming JPM TDF in comparison.

89.    **Figure 2** below provides a summary of JPM TDF's 3- and 5-year investment returns and metrics underperformance compared to industry leading available alternative target date series (described in more detail below) in 2018 and 2019. Over those two years, available data showed that JPM TDF underperformed in 3- and 5-year lookback metrics against four industry leading TDFs in 100% of time periods of available data measured. The JPM TDF therefore consistently underperformed for two years by the end of 2019 across all metrics.

---

[11] Under returns and MPT metrics.

**Figure 2**

Performance Metrics Comparison Summary January 2018 - December 2019

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics Underperformed | Percentage of Metrics Underperformed |
|---|---|---|---|
| 3 - Year Return | 13 | 13 | 100% |
| 5 - Year Return | 12 | 12 | 100% |
| Sharpe Ratio - 3 - Year | 13 | 13 | 100% |
| Sharpe Ratio - 5 - Year | 12 | 12 | 100% |
| Information Ratio 3 - Year | 13 | 13 | 100% |
| Information Ratio 5 - Year | 12 | 12 | 100% |
| Alpha 3 - Year | 13 | 13 | 100% |
| Alpha 5 - Year | 12 | 12 | 100% |
| Sortino Ratio - 3 - Year | 13 | 13 | 100% |
| Sortino Ratio - 5 - Year | 12 | 12 | 100% |
| Batting Average 3 - Year | 13 | 13 | 100% |
| Batting Average 5 - Year | 12 | 12 | 100% |
| Turnover Ratio | 14 | 14 | 100% |
| **Total** | **164** | **164** | **100%** |

90.     The JPM TDF underperformed in 164 out of 164 (100%) of time periods for each metric[12] examining 3- and 5-year lookbacks. Given this information, a prudent fiduciary would have had no reason to expect JPM TDF to outperform its current AF TDF investment in the future. Unsurprisingly, the decision to remove the AF TDF series in 2020 to replace it with the inferior JPM TDF series based on this information resulted in millions of dollars of harm to the Plan.

91.     A prudent fiduciary following the standard of care under the circumstances then prevailing in 2020 (including the examination of 2018 and 2019 3- and 5-year lookback data) would have evaluated the JPM TDF series against, their current TDF, under the MPT accepted investment metrics set forth below.

92.     Regardless of which combination of reasonable metrics chosen, a fiduciary acting under the prudent investor standard under the circumstances then

---

[12] Each Representing the total number of available data points for each metric analyzed from January 2018 through December 2019.

- 21 -

CLASS ACTION COMPLAINT

prevailing in 2020, **could not have concluded that it was prudent to remove the AF TDF series and replace it with the JPM TDF series** unless they employed a flawed process.

93. The same applies if the Fiduciaries' decision to remove the AF TDF in favor of the JPM TDF was made at a time when 2020 data was already available, see **Figure 3** below which provides a summary of JPM TDF's 3- and 5-year investment returns and MPT metrics underperformance compared to AF TDF January 2020 through December 2020.

94. In 2020, available data showed that JPM TDF underperformed AF TDF in 3- and 5-year lookback metrics in 100% of time periods of available data.

**Figure 3**

Performance Metrics Comparison Summary January 2020 - December 2020

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics Underperformed | Percentage of Metrics Underperformed |
|---|---|---|---|
| 3 - Year Return | 7 | 7 | 100% |
| 5 - Year Return | 6 | 6 | 100% |
| Sharpe Ratio - 3 - Year | 7 | 7 | 100% |
| Sharpe Ratio - 5 - Year | 6 | 6 | 100% |
| Information Ratio 3 - Year | 7 | 7 | 100% |
| Information Ratio 5 - Year | 6 | 6 | 100% |
| Alpha 3 - Year | 7 | 7 | 100% |
| Alpha 5 - Year | 6 | 6 | 100% |
| Sortino Ratio - 3 - Year | 7 | 7 | 100% |
| Sortino Ratio - 5 - Year | 6 | 6 | 100% |
| Batting Average 3 - Year | 7 | 7 | 100% |
| Batting Average 5 - Year | 6 | 6 | 100% |
| Turnover Ratio | 7 | 7 | 100% |
| Total | 85 | 85 | 100% |

95. Not a single data point available at the time supported Defendants' decision to remove the AF TDF and replace it with the JPM TDF.

96. Prudent fiduciaries confronted with this reality would have continued to retain the AF TDF instead. There was no need for any action as Defendants' monitoring report clearly outlined.

### i. Vintage-to-Vintage Comparison

97.     As outlined above, a prudent fiduciary examining both the AF TDF *series* and JPM TDF *series* in 2020 (under the circumstances then prevailing) would not have removed the AF TDF and replaced it with JPM TDF, considering the dramatic level of JPM TDF's underperformance on a series-to-series basis.

98.     But while the results of the series-level comparisons make clear that conducting a vintage-to-vintage comparison would have also revealed the same significant underperformance.

99.     Unsurprisingly, the vintage-to-vintage comparison likewise would have illustrated to the Fiduciaries that the JPM TDF's performance was inferior to the AF TDF under the circumstances then prevailing in 2020 (2018, 2019, and at least partial 2020 data).

100.   Each of the corresponding JPM TDF vintage **underperformed at all times** the AF TDF when evaluated by the commonly accepted MPT metrics (Sharpe, Sortino, Alpha, etc.).

101.   **Appendix A** to this complaint sets forth the comparison of every vintage of the JPM TDF series to the same vintage for the formerly held AF TDF series.

102.   For each JPM TDF vintage, the tables in **Appendix A** provide the investment metrics identified throughout this complaint for the years immediately preceding the Class Period, which was the most up to date and relevant data available to the fiduciaries. If the JPM TDF series vintage underperformed AF TDF, then the metric is highlighted in red. If the JPM TDF series vintage outperformed AF TDF, the metric is highlighted in green, and ties are left white. When data is not available the space is left blank. The 2030 vintage comparison of JPM TDF to AF TDF from **Appendix A** is set forth below as **Figure 4**.

**Figure 4**
**JPMorgan SmartRetirement® 2030 R5**

| JSMIX | 2018 | 2019 | 2020 |
|---|---|---|---|
| 3 - Year Return | 5.27% | 9.88% | 7.92% |
| 5 - Year Return | 4.40% | 6.81% | 9.66% |
| Sharpe Ratio - 3 - Year | 0.538 | 0.996 | 0.529 |
| Sharpe Ratio - 5 - Year | 0.480 | 0.692 | 0.793 |
| Information Ratio 3 - Year | -0.724 | -0.118 | -0.957 |
| Information Ratio 5 - Year | -0.025 | -0.312 | -0.709 |
| Alpha 3 - Year | -1.22% | -0.47% | -1.18% |
| Alpha 5 - Year | -0.16% | -0.58% | -0.99% |
| Sortino Ratio - 3 - Year | 0.742 | 1.482 | 0.772 |
| Sortino Ratio - 5 - Year | 0.697 | 1.051 | 1.178 |
| Batting Average 3 - Year | 0.444 | 0.500 | 0.472 |
| Batting Average 5 - Year | 0.517 | 0.483 | 0.483 |
| Turnover Ratio | 30.00 | 19.00 | 51.00 |

103.    **Figure 5**, below, provides the same investment metrics from the AF TDF vantage point. As above, if the comparable AF TDF vintage outperformed the JPM TDF vintage, then the metric is highlighted in green. If the AF TDF vintage underperformed the JPM TDF it is highlighted in red and ties are left white. The 2030 vintage AF TDF comparison to JPM TDF from **Appendix A** is set forth below.

**Figure 5**
**American Funds 2030 Trgt Date Retire R6**

| RFETX | 2018 | 2019 | 2020 |
|---|---|---|---|
| 3 - Year Return | 6.92% | 10.86% | 9.84% |
| 5 - Year Return | 5.63% | 8.07% | 11.06% |
| Sharpe Ratio - 3 - Year | 0.777 | 1.157 | 0.711 |
| Sharpe Ratio - 5 - Year | 0.639 | 0.853 | 0.981 |
| Information Ratio 3 - Year | 0.470 | 0.568 | 0.364 |
| Information Ratio 5 - Year | 0.790 | 0.537 | 0.270 |
| Alpha 3 - Year | 0.70% | 0.89% | 1.18% |
| Alpha 5 - Year | 1.10% | 0.77% | 1.04% |
| Sortino Ratio - 3 - Year | 1.135 | 1.766 | 1.135 |
| Sortino Ratio - 5 - Year | 0.987 | 1.352 | 1.593 |
| Batting Average 3 - Year | 0.611 | 0.611 | 0.556 |
| Batting Average 5 - Year | 0.617 | 0.583 | 0.533 |
| Turnover Ratio | 8.00 | 0.00 | 8.00 |

104.    **Figure 6** provides the difference in performance from the JPM TDF vantage point. If the difference is in favor of JPM TDF it is highlighted in green. If the difference is in favor of the AF TDF it is highlighted in red.

**Figure 6**

JPMorgan SmartRetirement® 2030 R5 & American Funds 2030 Trgt Date Retire R6
Comparison

| | 2018 | 2019 | 2020 |
|---|---|---|---|
| 3 - Year Return | 1.65% | 0.97% | 1.92% |
| 5 - Year Return | 1.23% | 1.27% | 1.40% |
| Sharpe Ratio - 3 - Year | 0.239 | 0.161 | 0.182 |
| Sharpe Ratio - 5 - Year | 0.158 | 0.161 | 0.188 |
| Information Ratio 3 - Year | 1.195 | 0.687 | 1.321 |
| Information Ratio 5 - Year | 0.815 | 0.849 | 0.978 |
| Alpha 3 - Year | 1.92% | 1.36% | 2.36% |
| Alpha 5 - Year | 1.26% | 1.34% | 2.03% |
| Sortino Ratio - 3 - Year | 0.392 | 0.284 | 0.363 |
| Sortino Ratio - 5 - Year | 0.290 | 0.301 | 0.415 |
| Batting Average 3 - Year | 0.167 | 0.111 | 0.083 |
| Batting Average 5 - Year | 0.100 | 0.100 | 0.050 |
| Turnover Ratio | -22.00 | -19.00 | -43.00 |
| # of Underperforming Metrics | 13 | 13 | 13 |
| # of Total Metrics | 13 | 13 | 13 |
| % of Underperforming Metrics | **100%** | **100%** | **100%** |

105. As the 2030 comparison examples demonstrate, JPM TDF underperformed the AF TDF in all metrics in 5- and 3-year lookbacks in both 2018, 2019, and 2020 which represents all the data available to the Fiduciaries in 2020.

106. **Appendix A** further provides the same charts demonstrating underperformance of JPM TDFs in comparison with the AF TDFs across the 2030-2060 vintages.

107. Any fiduciary following a prudent process would have reviewed these metrics which clearly show that replacing the AF TDF with JPM TDF was imprudent. No reasonably prudent fiduciary reviewing the readily available information at the time this decision was made in late 2020 or later could have justified replacing AF TDF with JPM TDF.

108. Defendants' decision to replace AF TDF with JPM TDF and to retain JPM TDF—even in the face of overwhelming evidence of JPM TDF's underperformance—demonstrates a profound breakdown in their fiduciary process—the data was not close.

109. As a direct result of this conduct, the Plan participants have suffered investment losses of millions of dollars.

- 25 -
CLASS ACTION COMPLAINT

**B. Defendants Also Violated ERISA's Fiduciary Duty of Prudence by Imprudently Selecting and Retaining Higher-Cost Share Classes for the JPM TDFs.**

### i. Background on mutual fund costs.

110.  Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund.

111.  Almost every mutual fund offers different share classes to investors. Generally, mutual funds offer at least one "retail," "institutional," and "retirement" share classes, among others.

112.  Retail share classes of mutual funds are designed for small individual investors, while institutional share classes are designed for large and/or institutional investors.  Retail share classes are identical to institutional share class funds in every respect, except for higher fees.

113.  Mutual fund companies generally try to compete for investment dollars by offering larger and/or institutional investors lower-cost share classes.

114.  The Department of Labor has stated that "[i]nstitutional mutual funds typically charge lower expense ratios than do the retail funds with similar holdings and risk characteristics. One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds."[13]

115.  The costs may differ among share classes, but the investment product is identical—the managers, investment styles, and stocks are not merely similar, but identical.

116.  The principal difference between the share classes is that the mutual fund charges different fees based on the class chosen and negotiated by the investor. The mutual fund company is incentivized to sell the most expensive share class because it increases profit.

---

[13] U.S. Dep't of Labor Pension & Welfare Ben. Admin., Study of 401(k) Plan Fees and Expenses § 2.4.1.3 (Apr. 13, 1998).

117. Lower-cost institutional share classes of mutual funds are available to institutional investors, like the Company.

118. Minimum investment thresholds for cheaper share classes are routinely waived for retirement plans.

119. Therefore, investment managers of large pools of assets make lower-cost share classes available for retirement plans of the Plan's size upon request, even if minimum investment thresholds were not satisfied.

### ii. Defendants Lacked a Prudent Process in Selecting and Retaining the R5 Share Class for the JPM TDF Series.

120. At all relevant times, Defendants had access to these low-cost institutional share classes of mutual funds. They either met the minimum investment requirements for these funds or had the option to negotiate with the investment provider to waive the minimum investment requirements.

121. Despite having the opportunity and obligation to monitor and leverage their position to negotiate lower-cost share classes, the Defendants imprudently chose to offer higher-cost fund share classes as investment options for the Plan.

122. Thus, the Plan fiduciaries wasted Plan assets by failing to (1) monitor the available share classes, (2) select the lowest share class of the funds for inclusion in the plan menu, and/or (3) negotiate for a lower cost share class at any point following initial selection of the fund.

123. In 2021, Defendants switched to the JPM TDF series share class R5, with an expense ratio variable from 0.45% - 0.55%. Cheaper share classes for the JPM TDF such as the "R6" share class were available at all relevant times and had a materially lower expense ratio variable from 0.35% - 0.45%. During all relevant times, the less expensive JPM TDF R6 share class was available to the Defendants and easily identifiable as it was disclosed in JP Morgan's annual prospectus.

124. Defendants wasted money by selecting the R5 share class of the JPM TDF instead of the identical and cheaper R6 share class. Despite the existence of

lower-cost alternative share classes available to Plan Fiduciaries, they failed to switch to the lower-cost share class at any point thereafter.

125.   The following chart illustrates the differences between the JPM TDF R5 share class (Defendant's chosen class; designated "JPMorgan SmartRetirement R5" in the table) and the cheaper share class "R6" (designated "JPMorgan SmartRetirement R6") with regard to expense ratios:

**Figure 7**

### Share Class & Expense Ratio by Year

| Ticker | Fund Name | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| JNSIX | JPMorgan SmartRetirement® 2025 R5 | 0.51% | 0.48% | 0.44% | 0.45% | 0.45% |
| JNSYX | JPMorgan SmartRetirement® 2025 R6 | 0.41% | 0.38% | 0.34% | 0.35% | 0.35% |
| | Difference | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% |
| JSMIX | JPMorgan SmartRetirement® 2030 R5 | 0.52% | 0.49% | 0.45% | 0.45% | 0.45% |
| JSMYX | JPMorgan SmartRetirement® 2030 R6 | 0.42% | 0.39% | 0.35% | 0.35% | 0.35% |
| | Difference | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% |
| SRJIX | JPMorgan SmartRetirement® 2035 R5 | 0.54% | 0.51% | 0.49% | 0.50% | 0.49% |
| SRJYX | JPMorgan SmartRetirement® 2035 R6 | 0.44% | 0.41% | 0.39% | 0.40% | 0.39% |
| | Difference | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% |
| SMTIX | JPMorgan SmartRetirement® 2040 R5 | 0.55% | 0.52% | 0.50% | 0.50% | 0.49% |
| SMTYX | JPMorgan SmartRetirement® 2040 R6 | 0.45% | 0.42% | 0.40% | 0.40% | 0.39% |
| | Difference | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% |
| JSAIX | JPMorgan SmartRetirement® 2045 R5 | 0.55% | 0.52% | 0.51% | 0.50% | 0.49% |
| JSAYX | JPMorgan SmartRetirement® 2045 R6 | 0.45% | 0.42% | 0.41% | 0.40% | 0.39% |
| | Difference | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% |
| JTSIX | JPMorgan SmartRetirement® 2050 R5 | 0.55% | 0.52% | 0.51% | 0.51% | 0.49% |
| JTSYX | JPMorgan SmartRetirement® 2050 R6 | 0.45% | 0.42% | 0.41% | 0.41% | 0.39% |
| | Difference | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% |
| JFFIX | JPMorgan SmartRetirement® 2055 R5 | 0.55% | 0.52% | 0.51% | 0.51% | 0.49% |
| JFFYX | JPMorgan SmartRetirement® 2055 R6 | 0.45% | 0.42% | 0.41% | 0.41% | 0.39% |
| | Difference | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% |
| JAKIX | JPMorgan SmartRetirement® 2060 R5 | 0.54% | 0.52% | 0.50% | 0.51% | 0.49% |
| JAKYX | JPMorgan SmartRetirement® 2060 R6 | 0.44% | 0.42% | 0.40% | 0.41% | 0.39% |
| | Difference | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% |

126.   As seen in the above chart, the JPM TDF R5 share class consistently had an expense ratio materially higher than the R6 share class.

- 28 -

127. Despite the availability and identifiability of the cheaper institutional share class, Defendants consistently chose to retain investments in the investor share class during the class period.

128. JPMorgan made the R6 share class broadly available to employer plans before and during the Class Period, meaning a plan like the one at issue would not have been barred by investment minimums from selecting the lower-cost share class.

129. Hence, the Company qualified for the equivalent lower-cost plan during all relevant times.

130. The fact that Defendants failed to switch to the less expensive, but otherwise identical, share class is a testament to their lack of process in evaluating and selecting share classes.

131. Defendants still have not corrected their imprudent decision to offer the higher-cost JPM TDF share class R5 instead of the identical but cheaper share class R6. Defendants' failure to monitor and evaluate available share classes reflects Defendants' imprudent or absent processes in evaluating and retaining investment share classes for the Plan.

132. The lower-cost share classes of the identical mutual funds for the Plan have been available for years, some dating back to 2019 or before. At all times, Defendants knew or should have known about the differences in share classes and that a superior alternative investment was readily available. An adequate investigation, or even a simple review of the funds' prospectuses under consideration, would have uncovered the prudent alternative.

133. The share class selection error persisted in the plan for over five years. This is indicative of imprudent process in monitoring share classes or no process at all in reviewing and monitoring share class selections.

134. Defendants breached their fiduciary duties by pushing participant funds (via the QDIA) into a share class that costs materially more than the cheaper available share class.

CLASS ACTION COMPLAINT

135. The failure to select far lower-cost share classes for the Plan's mutual fund options—share classes that are identical in all respects (portfolio manager, underlying investments, and asset allocation), except for cost—demonstrates that Defendants acted imprudently.

136. At a minimum, Defendants failed to consider the size and purchasing power of the Plan when selecting share classes and failed to engage in a prudent process for the selection, monitoring, and retention of share classes of mutual funds.

137. In selecting share classes with a higher fee, Defendants demonstrated a lack of prudence when selecting and retaining investments. A prudent fiduciary must have a viable methodology to monitor and should easily spot the best share class options for the Plan.

138. As stated by the SEC Office of Compliance Inspections and Examinations, a fiduciary investment advisor "has failed to uphold its fiduciary duty when it causes a client to purchase a more expensive share class of a fund when a less expensive class of that fund is available."[14]

139. Here, a less expensive share class was available. At a minimum, Defendants could have obtained cheaper share classes of identical funds with a few simple phone calls.

140. The Plan offered and maintained higher cost share classes when identical lower cost class shares of the same mutual funds were available. Simply put, given the choice of two identical investments—with the same assets, investment style, and management—Defendants inexplicably chose the more expensive product. Defendants thus caused Plan participants/beneficiaries harm by forcing them to pay higher fees and causing lost yield and returns they rely on for retirement income. In doing so, Defendants undermined the very purpose of the Plan: to provide income security for participants/beneficiaries.

---

[14] "OCIE's 2016 Share Class Initiative", National Exam Program Risk Alert, Securities and Exchange Commission ("SEC"), Office of Compliance Inspections and Examinations, Vol. V, Issue 2 (July 13, 2016), ocie-risk-alert-2016-share-class-initiative.pdf.

CLASS ACTION COMPLAINT

141. Had Defendants implemented and followed a prudent process when selecting and retaining share classes for Plan funds, Plan participants would not have paid excessive share class fees and would have, at a minimum, hundreds of thousands more dollars in the Plan today.

## VII. CLASS ACTION ALLEGATIONS

142. Plaintiff brings this action on behalf of Plaintiff and the Class, which is defined as participants in and beneficiaries of the Plan but excluding Defendants; any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of any Defendant or is or was a partner, officer, director, or controlling person of any Defendant; the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of any Defendant; Plaintiff' counsel; judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

143. The Class Period includes the six years prior to the date of the filing of this Complaint through the date of judgment.

144. The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are suitable to common resolution.

145. Plaintiff's claims are typical of the claims of other members of the Class because their claims arise from the same events, practices and/or courses of conduct described above.

146. Plaintiff's claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits

to the Plan. Any such recovery from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

147. Plaintiff will fairly and adequately represent and protect the interests of the Class.

148. Plaintiff does not have any interests antagonistic to or in conflict with those of the Class.

149. Defendants have no unique defenses against Plaintiff that would interfere with Plaintiff' representation of the Class.

150. Plaintiff is represented by counsel experienced in prosecuting ERISA class actions and with particular experience and expertise in litigation involving ERISA breaches of fiduciary duty.

151. The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

152. The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

153. The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable

to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendants breached their fiduciary duties, which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants breached their fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly from the declaratory or injunctive relief or flow as a necessary consequence of that relief.

154.   The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies and damages will likewise predominate over any individual issues.

155.   A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the Plan.

156.   Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only

individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VII. PLAN-WIDE RELIEF

157.    ERISA authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). See 29 U.S.C. § 1132(a)(2).

158.    Indeed, ERISA breach-of-fiduciary duty actions generally hinge on the uniform conduct of plan fiduciaries with respect to the plan. *Hughes v. Nw. Univ.*, 595 U.S. 170, 176-77 (2022).

159.    Plaintiff here seek relief on behalf of the Plan, i.e., in this case for all losses to the Plan caused by Defendants' breaches, and not only the losses to Plaintiff' individual account.

## VIII. TIMELINESS

160.    Within the six-year period prior to Plaintiff filing this suit, Defendants violated one or more of their fiduciary obligations as described above.

161.    At all relevant times during the Class Period, Defendants also made affirmative misrepresentations to participants about the security of their investments, the competence of the portfolio fund managers, the performance history of their investments, and the amount of investment fees they were being charged.

162.    At all relevant times during the Class Period, Defendants intentionally concealed their fiduciary breaches to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

163.    Plaintiff did not acquire actual knowledge of these violations until shortly before commencing this action. Consequently, Plaintiff' claims in this action are timely under 29 U.S.C. § 1113.

**COUNT I: Breach of Fiduciary Duty of Prudence**
**(Against All Defendants)**

164. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

165. At all relevant times, the Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

166. ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments. 29 U.S.C. § 1104(a)(1)(B).

167. During the Class Period, Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan prudently and act with the care, skill, diligence, and prudence required by ERISA.

168. At all relevant times during the Class Period, Defendants breached their fiduciary duties of prudence in multiple respects by removing the well-performing AF TDF series and selecting and retaining the JPM TDF that provided no advantages and underperformed under AF TDF under all MPT metrics.

169. The fact that Defendants removed the AF TDF in favor of an option that underperformed under all metrics and provided no measurable advantage, raises an inference of imprudent process.

170. Defendants were directly responsible for: evaluating and monitoring the Plan's investment options, including the AF TDF series and JPM TDF series, in a prudent fashion; retaining well-performing funds, like AF TDF, and not to replace them with demonstrably worse performing funds, such as the JPM TDF.

171. Further, Defendants failed to prudently select and monitor their share class, which is demonstrated by the Fiduciaries selecting the more expensive and

otherwise identical R5 share class of the JPM TDF when the cheaper R6 was available to them.

172.   Defendants failed to employ a prudent fiduciary process by failing to monitor and evaluate their TDF option in comparison to other meaningful benchmark TDFs prior to and after selection.

173.   Defendants were directly responsible for: evaluating and monitoring the Plan's investment share class options, including those various share class offerings under the JPM TDF, in a prudent fashion; eliminating more expensive share classes for identical products; and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

174.   Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B).

175.   As a result of the Defendants' breach of their fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered millions of dollars in unreasonable and unnecessary monetary losses.

176.   Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breach of fiduciary duty alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

CLASS ACTION COMPLAINT

**COUNT II: Failure to Adequately Monitor Other Fiduciaries under ERISA (against the Company)**

177. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

178. The Company had the authority to appoint and remove members or individuals responsible for Plan investment management and was aware that these fiduciaries had critical responsibilities for the Plan.

179. In light of this authority, the Company had a duty to monitor those individuals responsible for Plan investment management to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

180. The Company had a duty to ensure that the individuals responsible for Plan investment management possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

181. The Company breached its duty to monitor individuals responsible for Plan investment management, by, among other things:

    a. Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses by imprudently switching from well-performing AF TDF to demonstrably worse JPM TDF for most of the Class Period;

    b. Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in

place for doing so, standing idly by as the Plan suffered significant losses by imprudently choosing higher-cost share class R5 of JPM TDF than necessary for most of the Class Period;

c. Failing to monitor the process by which Plan TDF were evaluated, failing to investigate the suitability of the JPM TDF based on failing to investigate the availability of alternative, prudent TDFs; and

d. Failing to remove individuals responsible for Plan investment management whose performance was inadequate in that they selected replacement of a well-performing AF TDF for the demonstrably worse JPM TDF, selected a higher-cost share class, then continued to maintain the worse-performing and more expensive share class of JPM TDF, all to the detriment of the Plan and Plan participants' retirement savings.

182. As a result of the foregoing breaches of the duty to monitor, the Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses amounting to millions of dollars.

183. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for Plan investment management. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## IX. PRAYER FOR RELIEF

Wherefore Plaintiff prays that judgment be entered against Defendants on all claims, and requests that the Court order or award the following relief:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiff as class representative, and appoint the firm Milberg, PLLC as class counsel;

B. Order Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

C. Impose a constructive trust over these profits;

D. Impose a monetary surcharge against Defendants and compel Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets in the JPM TDFs, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Plan participants would have made if the Defendants had fulfilled their fiduciary obligations by undertaking TDF suitability and comparative analyses on a timely basis;

E. Apportion all amounts recovered for the Plan among the Plaintiff and the Class;

F. Order that any amount to be paid to the Plan and/or accounts of Plaintiff and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability;

G. Require Defendants to pay attorneys' fees and the costs of this action pursuant to 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiff' counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action;

H. Award pre-judgment and post-judgment interest;

I. Award any other such relief the Court determines Plaintiff and the Class are entitled to pursuant to 29 U.S.C. § 1132(a);

CLASS ACTION COMPLAINT

J. Award such other relief as the Court may deem just and proper;

DATED: May 19, 2026                    Respectfully submitted,

                                       /s/ John J. Nelson
                                       John J. Nelson (SBN 317598)
                                       **MILBERG, PLLC**
                                       280 S. Beverly Drive, Penthouse
                                       Beverly Hills, CA 90212
                                       Tel: (858) 209-6941
                                       jnelson@milberg.com

                                       Alexandr Rudenco*
                                       **MILBERG, PLLC**
                                       800 S. Gay St., Suite 1100
                                       Knoxville, TN 37929
                                       Tel: (865) 247-0080
                                       arudenco@milberg.com

                                       *Pro Hac Vice Application Forthcoming*

                                       *Counsel for Plaintiff and
                                       the Prospective Class*

CLASS ACTION COMPLAINT